## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number:  **25-02772-eg**

## ORDER

The relief set forth on the following pages, for a total of 20 pages including this page, is
hereby ORDERED.

---

**FILED BY THE COURT**
**10/17/2025**



Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina

Entered: 10/17/2025

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | C/A No. 25-02772-EG |
| | |
| Victoria Richardson Ortiz, | Chapter 13 |
| | **ORDER GRANTING MOTION TO ASSUME OR REJECT EXECUTORY CONTRACT AND DENYING MOTION FOR RELIEF FROM AUTOMATIC STAY** |
| Debtor(s). | |

The question before the Court is whether a real estate installment purchase agreement constitutes an executory contract that can be promptly cured in a chapter 13, or a secured loan to be maintained and cured over the life of the plan.  Upon initial consideration, the issue presents no apparent complexity.  The resolution of this matter, however, is complicated by the history concerning the parties:  This is debtor's third bankruptcy case.  In the prior two cases, the creditor filed proofs of claim asserting secured status and, approximately a month before Debtor commenced the current bankruptcy case, filed a foreclosure action in state court.  The debtor now invokes the judicial estoppel defense because creditor is taking the position in this case that the agreement at issue is an executory contract—not a mortgage.  Based on the record before the Court, and after a thorough review of the evidence presented, the Court concludes that the creditor is not judicially estopped and finds that the agreement at issue constitutes an executory contract that Debtor must either assume and promptly cure or reject.

Booth Farms, LLC ("Booth Farms") filed a *Motion to Assume or Reject Executory Contract or, in the alternative, for Relief from Automatic Stay* (the "Motion") on September 16, 2025.[1]  Victoria Richardson Ortiz ("Debtor") filed a Reply in opposition to the Motion (the

---

[1] ECF No. 11.

"Response").[2]  At the Court's request, the parties filed a Joint Statement of Dispute on October 6, 2025,[3] and an evidentiary hearing was held on October 7, 2025.  The hearing was attended by counsel for Debtor; counsel for Booth Farms; Booth Farms' Manager, Gayle Booth ("Ms. Booth"); and counsel for the Chapter 13 Trustee.  Debtor was not present.  Booth Farms presented Ms. Booth's testimony in support of the Motion and introduced into evidence a copy of an Installment Purchase Agreement dated November 19, 2012 ("Exhibit 1") and a payment history ("Exhibit 2").  Debtor introduced into evidence a copy of the proof of claim filed by Booth Farms in C/A No. 20-02656 ("Debtor's Exhibit A").[4]  For the reasons set forth below, the Court grants Booth Farms' Motion to Assume or Reject the Executory Contract and denies its Motion for Relief from the Automatic Stay.

## FINDINGS OF FACT

### I.    The Installment Purchase Agreement

Booth Farms asserts it is the owner of real property comprised of a 1.01-acre lot located at 595 Grange Road, Sumter, SC 29150 (the "Property").  A mobile home titled in Debtor's name is located on the Property and serves as Debtor's principal residence.[5]  On November 19, 2012, Debtor entered into an Installment Purchase Agreement (the "Agreement") to purchase the Property from Booth Farms.[6]  According to Ms. Booth, the Agreement was prepared by her late husband, who was a lawyer and former Master-In-Equity for Sumter County and passed away in March of 2018.  The pertinent terms of the Agreement are summarized as follows:

---

[2] ECF No. 12, filed Sept. 22, 2025.
[3] ECF No. 18.
[4] The exhibits were admitted into evidence by stipulation of the parties.
[5] ECF No. 1. Schedule A/B, filed July 18, 2025.
[6] Ex. 1.

a.  Debtor was to purchase the Property from Booth Farms for $15,000.00 plus an annual percentage rate of 10%. The Agreement states that the total finance charge was $13,109.13, and the total of payments due over the term of the Agreement was $28,109.13.

b.  Debtor was to make 170 consecutive monthly installment payments of $165.32, due on the first day of each month for ten years, beginning December 1, 2012.

c.  A $50.00 late fee would be assessed on the 15th of each month and every month that total payment has not been received in full.[7]

d.  Debtor was to pay the entire balance due no later than 170 months after December 1, 2012 (i.e., February 1, 2027).

e.  Debtor was obligated to pay the property taxes and assessments beginning with the 2012 tax year to Booth Farms or its agent.

f.  Upon Debtor's completion of the installment payments, Booth Farms would convey Debtor fee simple title to the Property, free and clear of liens and encumbrances, but subject to applicable zoning ordinances, utility easements, taxes for the year in which title is acquired, and restrictive covenants.

The Agreement further states that should payment not be received, Debtor would be in default and Booth Farms, at its sole option and discretion and with written notice to Debtor, may elect to terminate the Agreement and retain all sums paid up to the time of default as liquidated damages and/or rent on the premises.[8] Lastly, under the section titled "Purchaser's Acknowledgment", the

---

[7] The Agreement further provides that payment would first be applied to the late fees that may be due, then to property taxes.

[8] More specifically, it provides that "[i]n the event the [Debtor] fail[s]to make the required payments, then this contract may be canceled by the Sellers and prior payments may be retained by Sellers in accordance with the terms and conditions . . . of the Agreement."

3

Agreement provides: "For purposes of the <u>South Carolina Consumer Protection Code</u>, the parties agree that this [Agreement] is the equivalent of a first mortgage purchase money lien on real estate, and is not subject to the provisions of said <u>Code</u>." At the hearing, the parties confirmed that there is no recorded mortgage on the Property.

Debtor is an elderly woman whose primary source of income is Social Security Disability.[9] As reflected in Exhibit 2, since entering into the Agreement, Debtor has paid Booth Farms, on an inconsistent basis from 2012 to present, approximately $19,321.95. Debtor has accrued significant arrearages over the course of the Agreement due to missed payments, late fees, and nonpayment of taxes and is currently due in the amount of $26,016.48, comprised of principal payments of $14,382.59, interest of $6,790.70, taxes in the amount of $546.13, late fees in the amount of $1,000, prepetition attorney fees in the amount of $3,000.00 and pre-petition costs of $297.06.[10]

## II.    Debtor's Bankruptcy Cases

This is Debtor's third bankruptcy case since 2019. In the first case, C/A No. 19-02301, filed on April 26, 2019 (the "First Case"), Debtor listed the debt owed to Booth Farms as a secured debt in the amount of $26,333.05.[11] Booth Farms filed a proof of claim, asserting a secured claim in the amount of $26,533.05.[12] According to Ms. Booth, she is not a lawyer and took over as Manager of Booth Farms upon her husband's death. She prepared and filed the proof of claim without the assistance of counsel and later amended it because of her initial struggle completing

---

[9] *See* Schedule I, ECF No. 1. Debtor's original schedules reflected a net monthly income of $397.00. She subsequently filed amended Schedules I and J, reflecting her income as including a monthly contribution from her daughter in the amount of $300.00, increasing her monthly net income to $697.00. *See* ECF No. 22, filed Oct. 9, 2025. Presumably the amendment was filed to support the feasibility of the proposed chapter 13 currently on file, wherein Debtor proposes to make monthly plan payments of $638.00, including a monthly payment on Booth Farm's claim in the amount of $541.00.
[10] Despite Debtor's payments over the years, the principal balance of the debt was not significantly reduced due to the accrual of late charges and taxes, to which Debtor's payments were applied first in accordance with the Agreement.
[11] Schedule D, C/A No. 19-02301, ECF No. 1.
[12] Proof of Claim No. 5-2, C/A No. 19-02301.

it.  The proof of claim included a Mortgage Proof of Claim Attachment and payment history

reflecting the "mortgage payments" received from Debtor since January of 2013.  Debtor's chapter

13 plan in the First Case was confirmed on September 4, 2019.[13]  The confirmed plan treated

Booth Farms as a secured creditor and provided for Debtor to make ongoing monthly payments

and arrearage payments to Booth Farms through the chapter 13 trustee using the conduit system.

Booth Farms did not object to its treatment under the plan.   Eventually, the First Case was

dismissed on June 9, 2020, due to Debtor's failure to make plan payments to the chapter 13 trustee.

Debtor refiled for chapter 13 bankruptcy relief on June 25, 2020 (C/A No. 20-02656, the

"Second Case").  She again listed the debt owed to Booth Farms on Schedule D as an undisputed

claim in the amount of $26,333.05.[14]  Booth Farms filed a timely proof of claim still asserting a

secured claim—this time in the amount of $25,217.39.[15]  Ms. Booth signed the proof of claim as

Agent for Booth Farms.  No attorney made an appearance on behalf of Booth Farms in the Second

Case.  Debtor's chapter 13 plan in the Second Case was confirmed on November 5, 2020, and

again provided for payments to Booth Farms as a secured creditor to be made through the chapter

13 trustee.[16]  Booth Farms did not object to this treatment.  Though Debtor made payments in

accordance with the confirmed conduit plan for nearly two years, she ultimately fell behind.  The

plan was subsequently amended in August of 2022 to account for the missed payments, and Booth

Farms did not object to the amended plan.[17]  On August 28, 2023, the Second Case was  converted

to a chapter 7.[18]  In her Statement of Intention, Debtor indicated that she planned to retain the

---

[13] Order Confirming Chapter 13 Plan, C/A No. 19-02301, ECF No. 20.
[14] C/A No. 20-02656, ECF No. 1.
[15] Proof of Claim No. 5-1, C/A No. 20-02656, filed Aug. 18, 2020.
[16] Order Confirming Plan, C/A No. 20-02656, ECF No. 21.
[17] Post-Confirmation Modified Ch. 13 Plan, C/A No. 20-02656, ECF No. 28;  Order Approving Debtor's Request to Modify Plan, C/A No. 20-02656, ECF No. 33, filed Oct. 6, 2022.
[18] C/A No. 20-02656, ECF No. 35.

property and reaffirm the debt owed to Booth Farms, but no reaffirmation agreement was ever filed with the Court.[19] Debtor received a discharge on November 29, 2023.[20]

On July 18, 2025, Debtor filed the current case (the "Current Case"), presumably in response to the pending foreclosure action that Booth Farms commenced against Debtor in the Court of Common Pleas for Sumter County, 2025-CP-4301045 on June 10, 2025.[21] At the hearing, counsel for Booth Farms explained the foreclosure action was commenced so that a court of competent jurisdiction may declare that Debtor has no equitable right of redemption, thus allowing Booth Farms to proceed with its contractual remedies. According to Ms. Booth's testimony, Booth Farms ultimately retained counsel in the summer of 2024 to commence the foreclosure proceeding in state court and the same counsel is representing Booth Farms in the Current Case. Booth Farms filed a proof of claim in the Current Case, which was prepared and signed by Booth Farms' counsel, asserting for the first time an unsecured claim in the amount of $26,016.48, based treatment of the Agreement as an executory contract.[22] Debtor listed the Property on Schedule A/B as being owned by Booth Farms LLC and indicated that her interest was via "Contract of Sale" and, on Schedule C, claimed an exemption for the Property in the amount of $13,306.00. In Schedule D, Debtor listed Booth Farms as a secured creditor with a claim in the amount of $14,023.95.[23] Unlike in the prior cases, Debtor also listed Booth Farms as the counterparty to an executory contract on Schedule G, describing the nature of the contract as a "Lease to Own".[24] In

---

[19] C/A No. 20-02656, ECF No. 47.

[20] Order Discharging Debtor, C/A No. 20-02656, ECF No. 50.

[21] Statement of Financial Affairs, C/A No. 25-02772, ECF No. 1, filed July 18, 2025. While the Complaint for the state court action was not introduced into evidence, the Court takes judicial notice of the public record of the state court action.

[22] Proof of Claim No. 3-1, C/A No. 25-02772, filed Sept. 22, 2025.

[23] C/A No. 25-02772, ECF No. 1.

[24] Upon questioning by the Court regarding the contradictory information in the Schedules, Debtor's counsel explained that the installment purchase contract was also listed in Schedule G because it was the position Booth Farm was taking at this point. He stated that he was trying to cure what Booth Farms indicates are defects in the plan.

her Statement of Financial Affairs, Debtor disclosed the pending foreclosure action filed by Booth

Farms and indicated the nature of the case to be "Foreclosure/Replevin/Installment Contract".

On the same day the Current Case was filed, Debtor filed a proposed chapter 13 plan, again

treating Booth Farms' claim as secured, this time in the amount of $14,023.95 and proposing to

make monthly payments to Booth Farms in the amount of $294.00 through the chapter 13 Trustee.

Booth Farms, through counsel, filed an objection to confirmation, asserting that it "is not the holder

of a secured claim"; rather, the "Agreement is an executory contract which must be assumed or

rejected".[25]  A couple of days after objecting to the plan, Booth Farms filed the Motion which is

at issue before the Court.  In her Response, Debtor posits that the Agreement should be treated as

a mortgage, and, due to Booth Farms' prior positions, the creditor should be "estopped from

denying the Debtor the right of redemption applicable to mortgages or the right to cure her

default."[26]  Debtor further states in the Response that "nevertheless, Debtor will agree to cure the

default of $26,015.48 by filing a new plan that cures the default within the plan term."[27]

On September 29, 2025, Debtor filed an amended plan, proposing to pay Booth Farms'

claim in full over the life of the plan with an interest rate of 9%, resulting in an estimated monthly

payment of $541.00.  Section 3.3 of the amended plan, which proposes this treatment, further notes

"see 6.1 for payment rationale".  In section 6.1, Debtor proposes to assume the Agreement and pay

the redemption amount for the entire Agreement through the plan as proposed in section 3.3.

In the Joint Statement of Dispute,[28] the parties list the issues for the Court to decide as

twofold: (a) whether the Agreement is an executory contract which must be assumed or rejected

---

[25] ECF No. 10, filed on Sept. 12, 2025.
[26] ECF No. 12.
[27] In a footnote, Debtor noted that "correspondence/bills from Creditor give varying amounts regarding balance;" however, at the hearing Debtor's counsel confirmed that the amount that Booth Farms asserts in its proof of claim is not in dispute.
[28] ECF No. 18, filed Oct. 6, 2025

and (b) whether the delinquency owed under the Agreement must be promptly cured or can be cured over the term of the Plan. Booth Farms takes the position that the Agreement is an executory contract and that "curing over the term of the Chapter 13 plan is not prompt".[29] Debtor, on the other hand, takes the position that Booth Farms has a mortgage and further posits that "[t]he contract that Creditor relies upon indicates that the installment contract is 'equivalent to an equitable mortgage.'" In the Response, Debtor mainly relies on the argument that Booth Farms is judicially estopped from "presenting a new theory for collection contrary to positions previously presented to this Court."

## CONCLUSIONS OF LAW

Booth Farms seeks an order from the Court requiring Debtor to assume or reject the Agreement pursuant to 11 U.S.C. § 365(d)(2), or, in the alternative, to grant relief from stay so that it may exercise its state law rights outside of bankruptcy.[30] Before delving into the legal nature of the Agreement, the Court will address Debtor's equitable defense, whereby she contends that Booth Farms is barred by the doctrine of judicial estoppel from asserting that the Agreement is an executory contract in the Current Case.

---

[29] Though Booth Farms did not assert what it meant by "promptly" in its pleadings, at the hearing it requested that the arrearages be paid within two to three months. When pressed as to the precedent relied upon for that short time period, Booth Farms' counsel stated that it would leave it to the Court to decide what the reasonable time period would be pursuant to precedent in this District.

[30] Section 365(d)(2) provides that upon request of any party to an executory contract or unexpired lease of residential real property, the court may order the trustee [here, Debtor] "to determine within a specified period of time whether to assume or reject such contract or lease."

1. **Judicial Estoppel Does Not Bar Booth Farm's Arguments Under the Facts of This Case**

For the reasons set forth herein and based on the facts of this case, the Court concludes that Booth Farms is not judicially estopped from asserting in the Current Case that the Agreement is an executory contract.

"Judicial estoppel is an equitable doctrine, designed to 'protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (internal quotation marks omitted)). Debtor, as the party seeking to invoke the doctrine of judicial estoppel, bears the burden of demonstrating that the elements are met. *In re Huggins,* 658 B.R. 821, 848 (Bankr. D.S.C. 2024). The Fourth Circuit has instructed that judicial estoppel applies whenever the following four elements are satisfied:

> (1) "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation;" (2) "the position sought to be estopped must be one of fact rather than law or legal theory;" (3) "the prior inconsistent position must have been accepted by the court;" and (4) "the party sought to be estopped must have intentionally misled the court to gain unfair advantage."

*Minnieland Private Day School, Inc. v Applied Underwriters Captive Risk Assurance Co., Inc.,* 867 F.3d 449, 458 (4th Cir. 2017) (quoting *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996)) (internal citations and quotation marks omitted). The final element has been characterized as "determinative." *Id.; Skoog v. Food Lion, LLC,* No. 2:24-cv-00323, 2024 WL 6079070 (D.S.C. Mar. 14, 2024). Ultimately, the Court has discretion regarding whether to invoke judicial estoppel, and the determination of whether to apply this doctrine must be decided upon the specific facts

and circumstances of the case. *Martineau,* 934 F.3d at 394 (citing *King v. Herbert J. Thomas Mem'l Hosp.,* 159 F.3d 192, 197 (4th Cir. 1998)).

Courts are instructed to apply judicial estoppel with caution. *Lowery v. Stovall,* 92 F.3d at 224. The use of this equitable defense should not "impinge on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement." *Kiawah Island Util., Inc. v. Westport Ins. Corp.*, No. 2:19-cv-1359, 2019 WL 5395966, at *6 (D.S.C. Oct. 22, 2019) (*quoting Teledyne Indus., Inc. v. N.L.B.R.*, 911 F.2d 1214, 1218 (6th Cir. 1990)). "The purpose of judicial estoppel is not to protect the litigants; it is to protect the integrity of the judicial system." *In re Reynolds,* 470 B.R. 138, 146 (Bankr. D. Colo. 2012) (citing cases). Applying the above four elements, the Court finds that judicial estoppel does not apply in this case.

As to the first element, Booth Farms filed proofs of claim in two separate prior cases asserting a secured claim against Debtor— a position plainly inconsistent with its claim in the Current Case that its interest is based upon an executory contract. Although the first element appears to be met, the second element is not. Booth Farms' position regarding the interpretation of the contract between the parties is a position of law, not fact. *See Minnieland Priv. Day Sch.,* 867 F.3d at 458 (finding that judicial estoppel did not apply because, among other reasons, the party's position revolved around the interpretation of a contract which, the Court concluded, presented a question of law); *see also Thalia S. ex rel. Gromacki v. Progressive Ins. Co.,* 736 S.E.2d 863, 865 (S.C. Ct. App. 2012) (stating the construction and enforcement of an unambiguous contract is a question of law for the court).

As to the third element, the Court never adjudicated the nature of the Agreement between the parties in the prior cases. Booth Farms simply filed a proof of claim in both previous cases

and did not raise an objection to its treatment under the plan.  Booth Farms was not represented by

counsel at the time, and Ms. Booth—who was not involved in the negotiation or preparation of the

Agreement and is not a lawyer—struggled to understand the paperwork when filing the proof of

claim on behalf of Booth Farms.  Though in both cases a plan was eventually confirmed without

a hearing, initially binding Booth Farms to the proposed treatment, the first case was dismissed

and the second eventually converted to chapter 7.  While arguments may be advanced that the

dismissal of the case—and possibly the conversion[31]—negates orders entered pursuant to 11

U.S.C. § 349 or unwinds the effect of the chapter 13 plan pursuant to 11 U.S.C. § 348, the Court

does not need to decide that issue because the other three factors support a finding that judicial

estoppel does not apply in this instance.

As to the last factor, Ms. Booth testified that she did not intend to gain any advantage over

the Debtor by filing the proof of claim in those cases as a secured claim; rather, it was a result of

her inexperience in dealing with the company's finances after her husband's death.  Moreover,

Booth Farms does not appear to have received any advantage as a result of claiming a secured

position as opposed to arguing that the Agreement was an executory contract in the prior cases.

To the contrary, had she asserted the position that the Agreement was an executory contract, the

payments she would have received through the plans that were eventually confirmed would have

been higher and the arrearage would have been cured over a shorter period of time.

Debtor did not advance any compelling arguments to dispute Ms. Booth's explanations.

Indeed, Debtor's listing Booth Farms as a counterparty to a "Lease to Own" contract in Schedule

G, and amending the plan in the Current Case to treat the debt in both sections 3.3 and 6.1

undermines her arguments when, for the first time, she is also treating the claim as both a secured

---

[31] The Second Case was converted to chapter 7 and a discharge was entered.  Neither party has raised the implications
of the conversion and chapter 7 discharge on the parties' property rights.

debt and an executory contract. The Court finds no indication that Booth Farms intentionally

misled the Court by asserting a secured claim in Debtor's prior bankruptcy cases; therefore, the

final element is also not met.  *See Huggins,* 658 B.R. at 848 (finding that judicial estoppel did not

apply where debtor's prior position was inadvertent and resulted from her confusion regarding the

nature of her interest); *Reynolds,* 470 B.R. at 146 (indicating that the position must result in

unfairness to the judicial system such that the litigant is playing "fast and loose" with the courts).

Debtor further argues that Booth Farms' filing of a foreclosure action in state court should

estop it from asserting that its interest is based upon an executory contract rather than a security

interest.  The foreclosure action has been stayed by the filing of the Current Case, and it does not

appear that the state court has opined on the nature of the Agreement in the foreclosure action or

taken any further action regarding the Property.  As explained by Booth Farms' counsel, the

foreclosure action was filed to obtain a ruling from a court of competent jurisdiction that Debtor

had no equitable right of redemption in the Property.  The state court had not yet done so when

this case was filed.[32]  Therefore, judicial estoppel does not preclude a determination of whether an

equitable right of redemption exists by this Court.[33]

---

[32] The Court takes judicial notice that the state court action was in its early stages and no answer had been filed at the
time of Debtor's bankruptcy filing.  The matter was referred to the Master in Equity for Sumter County by order
entered July 18, 2025.  On July 24, 2025, a Notice of Final Hearing in Foreclosure was issued by the state court, setting
a final foreclosure hearing for August 20, 2025.

[33] Although not raised by the parties, the Court has located a non-binding court decision from a bankruptcy court
addressing a similar fact situation but reaching a different decision.  In *In re Munoz,* 459 B.R. 621 (Bankr. S.D. Tex.
2011), a creditor had filed a proof of claim as a secured creditor in the debtors' first bankruptcy case, failed to object
to the debtors' chapter 13 plan valuing its claim, and the case was ultimately dismissed for failure to make payments.
In their second case, the debtors argued that the creditor should be barred from now claiming it had leased the property
to them.  The bankruptcy court agreed, applying the Fifth Circuit's three-factor test for invoking judicial estoppel and
concluding that by claiming that the debt owed was based upon a lease, the creditor was taking an inconsistent position
with the prior proceeding, the inconsistent position taken was not inadvertent, and the court had accepted the creditor's
prior position by confirming the plan.  The *Munoz* case is distinguishable from the case at bar because the Fourth
Circuit's standard for invoking judicial estoppel includes the additional element that the inconsistent position taken
be one of fact—not law.  *See Minnieland,* 867 F.3d at 458.  As discussed above, the position sought to be estopped in
this case is one of law.  Furthermore, in *Munoz,* no evidence was presented to prove or suggest that the creditor's prior
position was inadvertent.  *Munoz,* 459 B.R. at 623.  Here, the evidence indicates that Ms. Booth, who filed the proof
of claim in the prior cases, lacked knowledge of the nature of the Agreement and how to properly fill out the proof of

The Court observes that holding inconsistent positions in separate cases raises questions and exposes the party taking those positions to estoppel arguments, thus putting their latest position at risk. With that said, the application of the judicial estoppel doctrine is considered on a case-by-case basis. Here, under the precedent in this district and facts of this case, and after thorough consideration of the record before it and the testimony presented at the hearing, the Court concludes that judicial estoppel should not be applied here.

### 2. Debtor Has an Equitable Right of Redemption as to the Agreement

#### a. The Agreement Does Not Constitute an Equitable Mortgage

Having found that Booth Farms is not judicially estopped from claiming that the Agreement is an executory contract to be either assumed or rejected, the Court turns to the interpretation of the contract at issue. From the outset, the Court finds that the Agreement is not an equitable mortgage as Debtor appears to argue in the Joint Statement of Dispute.[34] Under South Carolina law, "an equitable mortgage is a transaction that has the intent but not the form of a mortgage which the court will enforce in equity to the same extent as a mortgage." *Walker v. Brooks,* 778 S.E.2d 477, 479 (S.C. 2015), *F. Gregorie & Son v. Hamlin,* 257 S.E.2d 699, 707-08 (S.C. 1979) (quoting *Shiver v. Arthur,* 32 S.E. 310, 312 (S.C. 1899)). Typically, a transaction giving rise to an equitable mortgage involves an absolute deed transferred from the borrower-grantor to the lender-grantee, which is accompanied by an agreement, oral or in writing, by the lender-grantee to reconvey the property upon payment of a debt according to its terms. *See*

---

claim form. Accordingly, the Court is not persuaded that the *Munoz* case should dictate a different outcome in this case.

[34] Debtor's counsel did not advance any argument in support of the position that the Agreement was an equitable mortgage at the hearing. While there is language in the Agreement stating that "[f]or purposes of the <u>South Carolina Consumer Protection Code</u>, the parties agree that this [Agreement] is the equivalent of a first mortgage purchase money lien on real estate, and is not subject to the provisions of said <u>Code,</u>" upon which Debtor's counsel seems to rely in support of his argument, Debtor was not present at the hearing to provide any testimony regarding the intent behind that language.

RESTATEMENT (THIRD) OF PROP.: MORTGAGES § 3.2 (Am. L. Inst. 1997).  Where "the evidence surrounding the transaction indicates the land transfer was intended only to secure a debt, a court may refuse to treat the conveyance as a sale and instead equitably impose on the parties the mortgage they intended to create." *Walker,* 778 S.E.2d at 479 (citing 59 C.J.S. *Mortgages* § 36). The focus of the Court's inquiry is the intent of the parties, which is evaluated at the time of the conveyance.  *Hamlin,* 257 S.E.2d at 701 ("[The court] must search for the intention of the parties at the time of the transaction and not as any of them may interpret their intentions at this time").

When determining the intent of the parties at the time of the transaction for purposes of analyzing whether a transaction is an "equitable mortgage", South Carolina courts have examined the following factors: (1) the existence and survival of a debt after the transaction in question; (2) a deed being executed simultaneously with a contract to reconvey; (3) previous negotiations of the parties and course of dealing leading up to the deed in question; (4) inadequate consideration or price; (5) dealings between the parties; and (6) the terms of the contract for reconveyance.  *Hamlin,* 257 S.E.2d at 702-8.  Applying these factors, the Court finds that the Agreement is not an equitable mortgage.  There was no deed executed in connection with the transaction, Debtor never had title to the land at any point, and there was no reconveyance contemplated.  *See Lewis v. Premium Inv. Corp.,* 568 S.E.2d 361, 363-64 (S.C. 2002) (finding that an installment land contract was an executory contract and not an equitable mortgage); *In re Kingsmore,* 295 B.R. 824, 824 (Bankr. D.S.C. 2002) (noting that the South Carolina Supreme Court did not equate an installment land contract with an equitable mortgage).

14

### b. The Agreement is an Installment Land Contract

Based on its review of the language of the Agreement and the evidence presented, the Court finds that the Agreement is an installment land contract.[35]   Accordingly, the Bankruptcy Code mandates that the Debtor as the purchaser must either assume or reject the Agreement.  11 U.S.C. § 365.  The parties agree that the Agreement is governed by South Carolina law.  *See also Drs. Hosp. of Augusta, L.L.C. v. CompTrust AGC Workers' Comp. Fund,* 636 S.E.2d 862, 864 (S.C. 2006) ("A contract is controlled by the laws of the State in which it is made and is to be performed.")  The Agreement contains a forfeiture clause, which allows Booth Farms to terminate the contract upon Debtor's default, recover the Property, and retain all payments.  Under South Carolina law, installment land contracts are generally treated as executory contracts and not as equitable mortgages.  *Kingsmore,* 295 B.R. at 825 (citing *Lewis,* 568 S.E.2d at 364 and other cases).

In *Lewis*, the South Carolina Supreme Court considered the issue of whether an equitable right of redemption existed despite a strict forfeiture provision in an installment land contract and held that "courts of equity can relieve a defaulting purchaser from the strict forfeiture provision in an installment land contract and provide the opportunity for redemption when equity so demands." *Lewis,* 568 S.E.2d at 364.  Debtor argues that she has an equitable right of redemption, which

---

[35] In *Lewis*, the South Carolina Supreme Court explained that:

> Real property is often sold under contracts that provide for the payment of the purchase price in a series of installments. These contracts, usually termed installment land contracts, are drafted in many ways. Typically, the vendor retains legal title to the property until all of the purchase price has been paid ... Also typically, the purchaser is entitled to immediate possession ... Installment contracts almost always contain forfeiture clauses. When enforced, these clauses enable the vendor to terminate the contract, recover the property, and retain all installments paid when the purchaser defaults.

*Lewis*, 568 S.E.2d at 363 (quoting 15 RICHARD R. POWELL, POWELL ON REAL PROPERTY § 84D.01 at 3 (2000)).

allows her to redeem the installment contract by paying the entire purchase price over sixty months

in her chapter 13 plan.  Under South Carolina law, "an equitable right of redemption exists if

redemption is equitable under the circumstances, and certain factors indicate equitable

circumstances." *Kingsmore,* 295 B.R. at 820.  These factors include:

> (1) the amount of the purchaser's equity; (2) the length of the default period; (3)
> the number of defaults; (4) the reason for delay in payment; (5) the speed in which
> equity is sought; (6) the value of improvements to the property; (7) the amount of
> money forfeited compared to the purchase price; (8) the adequacy of the property's
> maintenance; and (9) the relationship of monthly payments to the fair rental value
> of the property.

*Id.* (citing *Lewis,* 568 S.E.2d at 365 n. 5).

Since 2012, Debtor has made approximately $19,000.00 in payments, which would be

forfeited if she were not permitted to redeem the Agreement.  This amount exceeds both the

purchase price for the Property and the value listed for the Property in Debtor's Schedules—

$14,000.  Debtor is elderly and Debtor's counsel indicated that she was unable to attend the hearing

to present testimony due to her age.  Debtor resides in a doublewide mobile home owned by her

that is located on the Property and valued at $13,306.00.[36]  Furthermore, it appears that moving

the mobile home off the Property would be costly[37] and it is unclear who would shoulder the

burden of the cost of removal if Debtor was required to vacate the Property.  At the hearing,

Debtor's counsel indicated that he would be filing amended schedules on behalf of Debtor showing

that her daughter would be providing additional funds to help fund the plan in this case and has

done so.[38]  During the Second Case, Debtor made regular plan payments to Booth Farms for

several years before her case was converted to Chapter 7.  Lastly, Booth Farms did not present any

---

[36] Schedule A/B, C/A No. 25-02772, ECF No. 1.  The Schedules indicate that Debtor has title to the mobile home, which is not retired.
[37] Debtor's counsel indicated that the cost to remove the mobile home would be approximately $11,000.00.
[38] *See supra* note 7. ECF No. 22.  An affidavit of Latinya Ortiz was filed indicating her agreement to contribute $300.00 per month to help Debtor pay expenses.

arguments or case law in the Joint Statement of Dispute indicating that no equitable right of
redemption should be found to exist.  For all these reasons, under the circumstances, the Court
finds that equity supports allowing Debtor an opportunity to redeem.

As this Court has previously held, "the proper way for debtors to exercise an equitable right
of redemption in a bankruptcy case in this District is to treat it as a property right which has
precluded the prepetition cancellation of the executory contract and therefore provides them an
opportunity to assume or reject the unterminated executory contract".  *In re Atchley,* 604 B.R. 255,
258 (Bankr. D.S.C. 2019) (*quoting Kingsmore,* 295 B.R. at 826)).  Section 1322(b)(7) of the
Bankruptcy Code provides that "the plan may— . . . subject to section 365 of this title, provide for
the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor
not previously rejected under such section."  Lease assumption under § 1322(b)(7) is subject to §
365(b)(1), which provides:

> If there has been a default in an executory contract or unexpired lease of the debtor,
> the trustee may not assume such contract or lease unless, at the time of assumption
> of such contract or lease, the trustee[39]—(A) cures, or provides adequate assurance
> that the trustee will promptly cure, such default. . .; (B) compensates, or provides
> adequate assurance that the trustee will promptly compensate, a party other than the
> debtor to such contract or lease, for any actual pecuniary loss to such party resulting
> from such default; and (c) provides adequate assurance of future performance under
> such contract or lease.

In a chapter 13 case, upon the request of a party to the contract, the Court can order a debtor
to determine whether to assume or reject an executory contract within a specified period of time.
11 U.S.C. § 365(d)(2).  Debtor has proposed a chapter 13 plan which provides for assumption of
the Agreement and cure of the default over sixty months.  Under South Carolina law, the

---

[39] Under 11 U.S.C. § 1303, the debtor has, exclusive of the trustee, the rights and powers of a trustee under sections
363(*l*) of Bankruptcy Code.  Section 363(*l*), in turn, provides that "[s]ubject to the provisions of section 365, the trustee
may use, sell, or lease property under subsection (b) or (c) of this section, or a plan under chapter 11, 12, or 13 of this
title may provide for the use, sale, or lease of property, notwithstanding any provision . . . that effects, or gives an
option to effect, a forfeiture, modification, or termination of the debtor's interest in such property."

Agreement is not an equitable mortgage and therefore, Debtor cannot treat the Agreement like a mortgage in her chapter 13 plan. *See Kingsmore,* 295 B.R. at 826.[40]  Pursuant to § 365(b)(1), if Debtor assumes the Agreement, she must *promptly* cure the default.  The Court determines whether a cure is prompt on a case-by-case basis. *In re Jackson,* 657 B.R. 809, 816 (Bankr. D.S.C. 2024). "In making this determination, bankruptcy courts have considered the following: (1) nature of leased property, (2) provisions of lease, (3) amount of arrearage under the lease, (4) remaining term of lease, and (5) provisions of debtor's proposed plan." *Id.* (quoting *In re Charlton,* 625 B.R. 315, 319 (Bankr. D.S.C. 2021). A longer cure period may be "prompt" if it is "relatively short compared to the prospective length of the parties' future relationship." *Id.* (citing cases).  Courts have previously found that two years or longer cure period for a default on a lease or executory contract was not sufficiently prompt under 11 U.S.C. § 365(b)(1). *See id.* (citing cases).  According to Booth Farms' Proof of Claim, the amount due under the Agreement—the cure amount—is $23,246.08.  Debtor's proposal to pay the full amount of the claim over a period of sixty months is longer than the term of the Agreement, which ends on February 1, 2027.  Accordingly, the plan must be amended to provide for a prompter cure period to meet the requirements of § 365(b)(1).[41]

---

[40] As the Court in *Kingsmore* noted after concluding that the installment land contract was to be treated as an executory contract:

> It would not be fair to allow debtors to use such an equitable right as a tool to convert the transaction from one where a transfer of title is conditioned to one where debtors assert a present ownership right in the property.  In addition, the Court believes it would be inequitable to allow debtors to treat such an equitable right in bankruptcy as tantamount to a right to purchase under which they could extend the time for performance under the contract or alter critical terms of the contract such as the interest rate or payment amount due the seller.  Indeed, a potential for abuse exists as purchasers under an executory contract could deliberately seek to invoke the right of redemption for the purpose of avoiding the requirements of § 365 and the unfavorable conditions of the contract while still seeking all of its benefits.

*Kingsmore*, 295 B.R. at 826.
[41] The Court will not decide in this Order how long of a period would be deemed "prompt", as that specific issue is not before it at this time.  However, the Court urges the parties to attempt to amicably determine a feasible period for Debtor to assume the Agreement and cure the arrearages.

### 3.   Relief from Stay is Not Warranted

If Debtor will not assume the Agreement and promptly cure the default, Booth Farms requests that relief from stay be granted pursuant to 11 U.S.C. §§ 362(d)(1) and (2) to allow it to enforce its rights in state court because it lacks adequate protection of its interest.   Section 362(d)(1) provides that the Court may grant relief from the automatic stay "for cause, including lack of adequate protection."  In turn, section 362(d)(2) provides that the stay must be lifted if "the debtor does not have an equity in such property; and . . . such property is not necessary to an effective reorganization."   Debtor has already proposed to assume the Agreement in her chapter 13 plan and cure the default by making payments to Booth Farms.   The Chapter 13 Trustee indicated that Debtor has been making payments in this case.  Thus, the Court will allow Debtor the opportunity to amend the plan consistent with the terms of this Order.  If Debtor fails to do so, Booth Farms can seek relief from stay at that time.  For these reasons, it appears that Booth Farms has adequate assurance of payment; therefore, stay relief is not appropriate at this time.

### CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Motion to Assume or Reject Executory Contract is **GRANTED**. Debtor may address the indebtedness to Booth Farms by rejecting the Agreement or assuming it and providing for prompt cure of the default in an amended chapter 13 plan to be filed within ten (10) days of the entry of this Order.

**IT IS FURTHER ORDERED** that Booth Farms' motion for relief from stay is **DENIED** without prejudice.

**AND IT IS SO ORDERED.**